NATHAN GOLDING, Respondent, v. MODERN WOOD-
MEN OF AMERICA, Appellant.

In the Kansas City Court of Appeals, January 29, 1923.

1. **INSURANCE: Warranty: Evidence Held to Show That Warranty of Insured That He Was in Good Health at Time of Application**

and Delivery of Certificate Was True. In an action on a benefit certificate issued by a fraternal beneficiary society, testimony of examining physician and of other witnesses, *held* to show that warranty involved in statements contained in application and proofs that insured was in good health at time of making application and delivery of certificate was true, even though insured had been previously discharged from the army on the ground that he was affected with psychoneurosis.

2. ——: ——: Waiver: Where Answer of Insured to Question in Application is Partial or Incomplete, and Defendant Fails to Make Further Inquiry But Issues Certificate, it Cannot Avoid Contract Even Though Answer Suggests an Affirmative Which is False or Contrary to Truth. Where question was asked in application as to whether insured had within last five years, consulted or been treated by any physician or physicians, and if so, to state name of physician and date, ailments and duration to which question insured answered "yes" that he had consulted physicians for personal ailment within said period, but did not give name of physician, merely naming an ailment and its duration, the defendant accepting the application and issuing certificate without requiring additional information, an objection to the answer was waived, if the statement was true as far as it went, and defendant cannot avoid the contract even though the answer suggests an affirmative which is false or contrary to truth.

3. ——: ——: Purpose of Inquiry Held to be to Obtain Names of Physicians so as to Make Further Investigation as to Condition of Health Rather Than Nature of Diseases. The purpose of an inquiry of an applicant for insurance as to whether he had been treated by physicians, and if so, to give the names of attending physicians, the nature of ailment and duration, was not so much to elicit the nature of the diseases he might have been treated for, but to learn the names of the physicians consulted or who prescribed for applicant, so as to make further investigation as to condition of his health, since the inquiry had reference to ailments or diseases regardless of whether they were slight or grave and to those which were not specifically inquired about by other questions.

4. ——: Naming One Particular Disease in Answer to Inquiry in Application Does Not Necessarily Imply That That Was Only Disease Applicant Had Been Treated For. It cannot be said that an answer of applicant for fraternal insurance to inquiry, named one disease for which he had been treated by physician for one week, necessarily implies that that was the only ailment or disease for which applicant had been treated.

5. ———: Erroneously Giving Wrong Name of Disease for Which Physician Was Consulted Does Not Preclude Recovery upon Certificate. Where insured in answering inquiry, contained in application, as to whether he had been treated by physicians for any disease, stated he had been treated for tonsilitis, when in fact it had been influenza, and insurer did not require him to name the physician from whom it could readily learn the true name of the disease, *held* insurer cannot throw upon the insured the risk of naming the disease correctly, and the answer did not preclude recovery upon the certificate.

6. ———: Giving Name of One Disease For Which Insured Was Treated by Physician Does Not Show Insured Would Not Have Named Physicians Who Treated Him For Other Diseases. Where fraternal beneficiary society, after being given, in answer to inquiry requiring names of physicians consulted and of diseases treated for, the name of one disease for which insured had been treated by physicians, but in which answer the insured omitted to name physicians, *held* the acceptance of the incomplete answer created a waiver, though insured had been treated for other diseases, because, if insurer had demanded that names of physicians be given, it cannot be inferred that insured would not have named all of them, but would have named only the physicians who treated him for the disease named.

7. ———: ———: Waiver of Requirement for Complete Answers Held to Have Been by Head Camp Officers and Not by Local Camp Officer. Where a fraternal benefit society issuing certificate, accepted application of insured, with answers to inquiries therein. which were incomplete or partial upon their face and wholly unanswered so far as the purpose of the inquiry, *held* that the waiver of the requirement for complete answers was by defendant's head camp officers who accepted application and issued certificate thereon and not by local camp officer who prepared application.

8. ———: ———: Physician Designated, a Local Camp Physician. Held on Question of Waiver to be Agent of Society and Not of Local Camp. Where by-laws of fraternal benefit society designated camp physician as one of officers of local camp and provided for his election, subject to the approval of the Supreme medical director who was authorized to remove him, *held* on the question of waiver that while the physician is called a local camp officer. he is not in point of fact, but is the agent of the society and not the local camp in examining applicants for insurance.

9. ———: ———: Clause That Knowledge of Camp Officer Preparing Application Should Not Bind Insurer, Held Under the Evidence, to

Have no Application. A clause that statements to or knowledge of one soliciting, taking or writing application should not bind society, has no effect, where evidence showed that applicant stated to camp physician who prepared application that he had been treated by physicians while ill in army training camp, and described the condition from which he suffered, which camp physician designated as the disease of "tonsilitis," without evidence that applicant knew the name of disease for which he had been treated.     .

10. ———: Demurrer: Pleading: Defense That Benefit Certificate Was Not Signed by Consul of Local Camp, as Required by By-Laws to be Available Must be Set Up in Answer. Where fraternal society urged that it was entitled to a directed verdict on the ground that the benefit certificate was not signed by the consul of local camp, as required by its by-laws, held not error to refuse directed verdict where such defense was not set up in answer.   .

11. ———: Initiation: Burden of Proof: Prima-facie Case: Proof of Delivery of Certificate Being Evidence of Valid Contract, Burden Was upon Fraternal Society to Show Insured Was Not Initiated, as Required by Its By-laws, Rendering Certificate of no Force or Effect. Where by-laws of fraternal beneficiary society provided that delivery of certificate should not be made to insured until after he was initiated into the local camp, and plaintiff alleged and proved that the certificate was issued and delivered, and that the insured was dead, he made a prima-facie case, as delivery of certificate is evidence of a valid contract, placing on the society the burden of showing that insured had not been initiated, even though other by-laws provided that certificate should not be of force and effect and liability should not begin until insured had been initiated.

12. INSTRUCTION: Waiver: An Instruction Which Was Incorrect in Construing Meaning of Question Contained in Application for Fraternal Insurance, Held Not Reversible Error, as Defendant Had Waived Complete Answer Thereto. An instruction which told the the jury in effect that inquiry, contained in application for fraternal insurance, as to whether applicant had had any of the diseases named, or other diseases for which applicant had been treated and of the physicians who had treated him, referred only to some settled disease as might result in impairment of health, but not to a mere trivial passing or temporary indisposition, held not reversible error, as defendant had waived complete answer to that question.

13. INSURANCE: Instruction: An Instruction Construing Inquiry as to Former Diseases, as Not Referring to Slight or Transient Indisposi-

tions Having no Bearing Upon General Helath, Held Correct Statement of Law. An inquiry of an applicant for fraternal insurance, with reference to former diseases, as bearing on the statement as to applicant's condition of health, *held* not to refer to trivial matters or to slight or transient indispositions which had no bearing upon general health and the continuance of life.

ON MOTION FOR REHEARING.

14. ———: ———: An Instruction Held Not to Warrant Recovery if Falsity of Answers of Applicant for Fraternal Insurance Were Innocently Made. An instruction which in effect told jury that if insured made a full and frank disclosure to defendant's camp physician of all matters claimed to have been misrepresented, and that physician thereupon filled out application in his own way and wrote down only so much of the information given him as he deemed important or essential, and if applicant acted in good faith and without intent to deceive, it was no defense that the statements and answers written down by the camp physician were not full and correct, *held* not to announce the rule that if applicant made incorrect answers, nevertheless, if he acted in good faith, they could not be depended upon to avoid the insurance as broken warranties.

15. ———: Fraud: Fraud on Part of Insured, or Any Attempt to Deceive Fraternal Society in Obtaining Insurance, Precludes Recovery, Even if Insured Made Complete Answers to Inquiries Contained in Application. In an action on fraternal certificate, even if camp physician acted in such a manner as to waive certain matters, yet if insured also had in mind an intent to deceive, and carried it out even in the slightest degree, his wrongful procedure would nevertheless permeate and taint his insurance, notwithstanding the camp physician's waiver.

Appeal from the Circuit Court of Jackson County.— *Hon. James H. Austin,* Judge.

AFFIRMED.

*J. L. Lorie* and *J. C. Rosenberger* for respondent.

*Truman Plantz, F. M. McDavid* and *Arthur N. Adams* for appellant.

TRIMBLE, P. J.—This action is on a benefit cer-

tificate for $1000 issued by the defendant, a fraternal beneficiary society, on the life of plaintiff's son, Charles Solomon Golding. Verdict and judgment were for plaintiff for the amount of the policy with interest, and defendant appealed.

The answer, after admitting the issuance of the policy, and the death of young Golding, set up, as a defense thereto, breach of warranty based on the fact that, in his application he stated: ''I am now of sound body, mind and health, and free from diseases or injury,'' and on the further fact, that, in said application, questions were asked and answered as follows:

''15.    a.    Have you within the last five years used any medicine, or consulted or been treated by any physician or physicians, or other person, in regard to personal ailment?    *Yes.*

b.    If so, give name and amount of medicine used, the name and address of each and all physicians or persons consulted or by whom treated, and dates, ailments, and duration of attacks?    *Tonsilitis for one week.*

c.    Was recovery complete?    *Yes.*

.    .    .

''20.    a.    Have you been an inmate of any hospital, *infirmary,* sanitarium, retreat, asylum or undergone a surgical operation?  *No.*''  .

The answer stated that the breaches consisted in this:

That at the date of the application and of receiving the policy, young Golding was not of sound body and health and free from disease but was afflicted with a serious malady or disease which had greatly impaired his health;

That the answer to question 15a ''was not full, complete and literally true,'' because applicant stated therein that the *only ailment* from which he suffered was tonsilitis for one week, when he had been afflicted with *influenza* in October, 1918, and was treated therefor

from October 20, to 29, 1918, and had had *bronchitis* and was treated therefor from November 4 to November 6, 1918, and "that the names of the physicians treating him for these diseases are unknown to the defendant," and that the answer to question 15a was further untrue in that the applicant was treated in the year 1918 by Dr. Jerowitz for bruises from an accident suffered by the said applicant; and

That the answer "No" to question 20a as to whether he had been an inmate of any hospital, *infirmary,* etc., was false and untrue, because in the fall of 1918, while a soldier in Camp McArthur, Texas, applicant was at various times in an Infirmary and was at said times treated therein.

The answer further set up as a defense to the policy that said Charles Solomon Golding was never "adopted" —i. e., initiated into the Society in accordance with the Ritual and as required by the by-laws and by the terms of the application, and that if there was any pretended adoption it was not had and made as required by the by-laws at a regular, special or adjourned meeting at the Camp Hall.

The plaintiff's reply was a general denial, together with the further plea that the adoption and initiation of Charles S. Golding as a member of the Subordinate Camp was waived.

The application, the certificate and the by-laws set forth in the clearest, most explicit and positive terms:

1.    That the application was the basis on which the Benefit Certificate was issued, and the Head Officers determined from the information contained in the application, whether a certificate would issue or not;

2.    That the answers to the questions in the application are strictly warranted to be "full, complete and literally true" and that the "exact literal truth of each" should be a condition precedent to any binding contract, and if said application was not "literally true in each and every part thereof" the certificate should

213 M. A.—12

be void; and that, as only the Head Officers of the Society had authority to determine whether a certificate would issue, and as they act upon the statements, answers and agreements in the application, "no statements, promises, knowledge or information had, made, or give by, or to, the person soliciting, taking, or writing this application . . . shall be binding on the Society, or in any manner affect its rights" unless reduced to writing and submitted to the Head Officers at or before the time a Benefit Certificate is issued;

3.    That no rights under the certificate should accrue until the applicant should be "regularly adopted in accordance with the Ritual, and . . . until the certificate . . . shall be manually delivered to me *after adoption* and while I am in sound health, and in pursuance of the by-laws of the Society." (These provided that upon receipt of the certificate the local clerk should notify the applicant and he should then be adopted by the camp at the next or some regular, special or adjourned meeting at the Camp Hall, but the certificate should not be in force until the ceremony of adoption shall have been performed, nor should the adoption take place until the benefit certificate had been received from the Head Camp and was in the hands of the local camp clerk.);

4.    That "no officer of the Society, nor any local camp or officer or member thereof, is authorized or permitted to waive any of the provisions of the by-laws . . . which relate to the contract between the member and the Society;"

5.    That forfeiture of benefits on the death of a member should be the result of "false or untrue answers, concealment, evasion of facts in his application, or in his answers in his medical examination relating either to his mental or physical condition, age, disease, consultation with physicians, or as to any other facts or condition upon which information is sought;"

6.    That no local camp, nor any of the officers there-

of, should have right or power to waive any of the by-laws of the Society.''

The application was signed February 18, 1919; the benefit certificate was issued March 20, 1919, and young Golding died on April 26, 1919. The Medical Proof of Death, signed by the family physician, Dr. Jerowitz, showed that he died of ''acute endocarditis and uraemia from acute. nephritis *following influenza,* and that the remote and predisposing. cause of death was ''influenza while in Camp.'' The proofs further showed that young Golding was treated in his last illness from April 17, 1919, to April 25, 1919; and that Dr. Jerowitz had, about a year before, treated him for ''bruises from accident about a year ago.'' At the trial Dr. Jerowitz, a witness for plaintiff, testified that on April 17, 1919, he was called to attend yound Golding at his home and found him in convulsions due to acute uraemic poisoning, or uraemia which is an acute inflammation of the kidneys known as Brights disease or acute nephritis; that acute endocarditis was an inflammation of the inner lining of the heart caused from the same infection that caused the kidney trouble and ''that might have been caused from influenza or might have been caused from tonsilitis;'' that an acute attack meant a sudden onslaught of the disease and not a chronic case. Dr. Jerowitz's testimony, in other respects, will be referred to later on.

Young Golding was born in Kánsas City, April 20, 1897, and was at the time of his application nearly 22 years old. He lived with his father at the latter's home in the rear portion of his second hand furniture store, and assisted his father therein; his duties, among other things, being to deliver furniture.

On September 16, 1918, our country then being in the Great War, young Golding was drafted and sent as a private to Camp McArthur, Texas. The military records show that on October 20, 1918, he was sent to the camp Infirmary on account of *Influenza* and was treated there until October 29, 1918, when he was re-

stored to duty; that on November 4, 1918, he was again sent to the camp Infirmary, this time for "Bronchitis, acute, catarrhal, bilateral, mild" and was treated there until November 6, 1918, when he was again restored to duty; that for a period of three weeks he was "under observation" by one or more of the members of the Board of Medical Officers, and said board made a report on his case which, in part, is as follows:

"From a careful consideration of all the evidence obtainable in the case, and a critical examination of the soldier, we find: That he is unfit for service as a soldier because of Pyschoneurosis. This man shows a constitutional instability which renders him unfit because of this nervous disease.

Soldier states that he had had nervous attacks the last five years.

The history in this case is unmistakable, that the condition existed prior to entry into Federal service. This man is unfit for general military service and unfit for domestic service."

Said board found that the disqualifying disability existed "prior to enlistment and did not originate in line of duty" and recommended that he "be discharged for disability which was not incurred in line of duty," and on said recommendation he was discharged November 21, 1918.

He returned home, his father says, in good health, and, after a few days' visiting with his folks, he voluntarily resumed his duties in the store. His father also says he continued to work in the store and to be in good health up until the day he was taken sick in his last illness.

Three months after his return from the army, young Golding was solicited by "Deputy Head Consul" Friedman, to join Subordinate lodge, Dewey Camp, No. 5609, in Kansas City, of the defendant Order. He agreed to join, and Dr. Zoglin, the local Camp Physician, examined him and wrote out the application, and young Golding

signed it. Zoglin says this was done in the presence of Friedman. The answers and indeed all of the written parts in the blanks of the application are in the handwriting of Dr. Zoglin, except, of course, Golding's signature.

According to Zoglin's Medical Report, which was attached to the application, he made a searching physical examination of the applicant and found him in good health and physical condition and a first class risk, and recommended him for Beneficial Membership. At the trial, Zoglin, testifying for plaintiff, said that what he stated in his Medical Report was "absolutely true. I found him perfectly well in all conditions."

In explanation of the answer in the application of "Tonsilitis for one week," Dr. Zoglin testified that young Golding answered or told him he was sick with a cold and sore throat while in the army; that Golding did not say he had the "flu" but that he had a bad cold, coughing and sore throat and had been treated in the infirmary of the army, and described his symptoms as sore throat, cough and temperature and headache. Zoglin further testified that the most prominent symptoms of influenza are sore throat, temperature, cough, ache and pain; that, from his experience as a medical officer in about six camps, he having just been discharged from such service when he wrote the application, he knew that an infirmary in an army camp was a place where "mild cases—anything—a little cut or bruise, or a cold, or any mild case, is taken care of" and that when the above information was given him by young Golding he did not consider it necessary, in filling out the information, to put any more in the application than he did put in "because tonsilitis or any case would include almost any bad cold that was around," and that in giving the answer "Tonsilitis for one week' he considered he had "fully covered the matter." That he did not consider an infirmary in an army camp the same as an infirmary in civil life, that in the army an infirmary was not con-

sidered as a hospital but "just emergency treatment," and hence he wrote "No" to the question as to whether he had been an inmate of any hospital, infirmary, etc. On cross-examination he said, "Well, in my opinion the army hospitals were not considered hospitals at all," and "I knew he was in the infirmary, but I had not paid enough attention to it to mark it down."

Dr. Jerowitz, testifying in reference to his treatment of young Golding about a year before his death, for "bruises from an accident," etc., mentioned in the Medical Proof of Death, said that Golding was accidentally thrown out of a wagon and had "various bruises about his leg and shoulder and so on" and that it was "a trivial affair" although he visited him once a day for four or five days.

With reference to psychoneurosis mentioned in the report of the Army Medical Board, Dr. Zoglin testified that, in the Medical profession, psychroneurosis meant plain ordinary nervousness and that the term covers any nervous condition. Dr. Jerowitz testified that he had known young Golding for ten years, and he was the family physician and that he saw him casually if he was called to see some member of the family; that there was nothing wrong with young Golding so far as health was concerned, and he never knew of his having nervous attacks; that psychoneurosis was a general term covering a wide field, it would cover any mental or physical condition; worry would be a part of it; that psychoneurosis may be a temporary condition, always disappearing when the cause is removed; that homesickness may be a principal feature of phychoneurosis disappearing upon the removal of the cause by return home; and that in the case of a boy 21 years old who had always lived at home being sent as a soldier to a distant camp among strangers and away from his family, such an experience could cause psychoneurosis.

As to the statement in the Medical Proof of Death that the remote and predisposing cause of death was

"Influenza while in Camp" Dr. Jerowitz testified that young Golding was in a "semistuporous condition," and that, in answer to his question if he had been sick in camp, the patient said "Yes." That was all he could get out of him, and "assuming everyone in the country at that time had influenza, I assumed it was influenza." He further testified that the condition he found him in may have been entirely due to tonsilitis if the boy had had tonsilitis in October, 1918. On cross-examination he said that because the boy told him he was sick during influenza time, and knowing that often in the army they had influenza he, the doctor, assumed that Golding did, that he thought of tonsilitis at the time but he didn't put it down because "influenza was so fresh in every doctor's mind, that it was natural to blame everything to that;" and that influenza sometimes results in poisoning the kidneys and could affect them.

Objections were made to the admission of most of the foregoing evidence, but as no specification of error on the ground of admission of evidence is made in the brief, no mention herein is made of such objections, nor is error, if any, in that regard considered.

As to the warranty involved in the statements that young Golding was in good health at the time of the application and of receiving the certificate, the evidence in behalf of plaintiff is that such was true. Indeed, the only source of any evidence to the contrary is in the report of the Army Medical Board and their conclusion that he was affected with a "constitutional instability" or "nervous disease" of psychoneurosis prior to his entry into the Service. As to the above warranty, therefore, it must be held, in view of the jury's verdict, that he was in good health at the time of the application and of the delivery of the certificate, and that there was no breach of warranty in that regard.

As to the alleged breach involved in the reply to inquiry No. 15, it will be observed that applicant said "Yes," he had consulted physicians for personal ailment

within the last five years, but, though asked to do so, did not give the name of any physician, merely naming an ailment and its duration. In other words, the answer to inquiry No. 15 was, on its face, partial or incomplete. Nevertheless defendant accepted the application and issued the policy, without requiring the name or names of physicians to be given. "Where an answer is upon its face . . . incomplete and assurer fails to avail itself of its rights by making further inquiries concerning the matter, or to do any act evidencing its dissatisfaction therewith, but on the contrary . . . issues the policy, it cannot avoid the contract *even though the answer suggests an affirmative which is false* or contrary to the truth." [3 Joyce on Ins., sec. 1914b.] And at section 1969 the same author says: "If partial answers are made, the warranty will not be extended beyond the answer or beyond what the answer fairly imports *within the ascertained intent of the parties.*" (Italics in both quotations ours.) In McDermott v. Modern Woodmen, 97 Mo. App. 636, 652, it is held, with regard to this same inquiry No. 15, that the object of this inquiry is very different from those relating to diseases he may have had or to the applicant's state of health; that the information sought to be elicited by it is "not so much the diseases he might have been treated for as the names and addresses of physicians whom he had consulted or who had prescribed for him, with the purpose of making further investigation as to the condition of his health." Said case holds that the purpose of said Inquiry No. 15 is to learn the names of the physicians consulted, no matter whether the ailment or disease, for which the consultation was had, was *slight* or *grave;* and that the *other* inquiries contained in the application were for the purpose of ascertaining the diseases applicant may have had, but that such other inquiries had reference to, and *would be understood by the parties to mean,* not a mere *temporary,* ailment, disorder or functional disturbance having no bearing upon

general health or continuance of life, but one of such a *serious* nature as would, *according to common understanding,* be called a disease and might indicate a vice in the constitution or have some bearing upon general health and the continuance of life. The course pursued in the case at bar would seem to bear out the above interpretation of inquiry No. 15 and its purpose, and also the purpose of the *other* inquiries as to the diseases applicant may have had. For although, in inquiry No. 26a, applicant was asked if he had ever had any one of a long list of diseases—among which were included bronchitis and la grippe—or "any other disease," and appellant answered "No," yet no defense was predicated on such question or answer, since such was not pleaded. [29 Cyc. 229; Harris v. Knights and Ladies of Honor, 129 Mo. App. 163, 166-167; American, etc., Ins. Co. v. Burr, 68 Fed. 873, 876; Chambers v. Northwestern, etc., Ins. Co., 67 N. W. 367; Gruwell v. National Council, 126 Mo. App. 496.]

It cannot be said that as the answer of "Tonsilitis for one week" necessarily implies that only *that* ailment was had for which a physician was consulted, and that if applicant consulted any other physician for any other ailment—accidental injury or bronchitis for instance—there was a breach of warranty as to that *part* of inquiry No. 15. This would make the warranty go beyond what the answer actually *says* and extend it to what the answer *suggests or implies,* which the above quotations from Joyce show cannot be done. Besides, we cannot say that, if applicant had been required to name the physicians he had consulted, he would not or might not have named them all but would merely have named the one or those who treated him for the disease referred to in the answer as tonsilitis.

Nor will it avail anything in the case at bar to claim that the answer "Tonsilitis for one week" was *complete* as to the name of the disease that was stated, and if the disease was influenza instead of tonsilitis, then the

answer was *untrue* as to the *disease named,* and hence there was a breach as to that. Such claim proceeds on the theory that when it is said "the warranty will not be extended beyond the answer" the meaning is that a partial answer, if *complete* as to the *part* answered, will support a warranty that is wholly contained within the limits of the partial answer, although a warranty will not be allowed to extend beyond such answer. Conceding for the sake of the argument that this last is correct, still, such claim is getting away from and losing sight of the purpose of inquiry No. 15 and of the purpose of the *other* inquiries as to the names of diseases had. It would seem the grossest injustice to say that if an applicant stated he had consulted a physician or physicians but, without saying whom he consulted, erroneously gave the wrong name of the disease for which consultation was had, he must lose his insurance, when the insurer, by requiring him to name the physician or physicians consulted, could readily learn from *him* or them the true name of the disease. The purpose of inquiry No. 15 being to get the names of the physician without regard to whether the trouble for which consultation was sought was grave or trivial, and the answer not meeting that purpose, the insurer cannot throw upon the insured the risk of naming the disease correctly.

For the same reasons it cannot be successfully asserted that acceptance of the answers to inquiry No. 15 in the shape they were in did not create a waiver because, if insurer *had* demanded that the name of the physician be given and applicant *had* given the name of the physician consulted for the disease named, it would not have been disclosed that the applicant had been treated by *other* physicians for *other* diseases; nor should it be said that by naming the trivial ailment of "Tonsilitis for one week" defendant was led to forego the right to know what physician or physicians treated applicant for the disease named. As said before, no one can say that if applicant had been required to name the

physicians he would not have named all of them but would have named only the one or those who treated him for the disease named.

There is no evidence that applicant intentionally and falsely gave the name of one disease which was a trivial one. On the contrary, the evidence in this case is that applicant told Dr. Zoglin, the Camp Physician, that he had been sick and in the infirmary at the army camp, and described his symptoms, and that Zoglin wrote down the answers. The question of whether applicant did this, and his good faith in doing so, was submitted to the jury, and they were told that if applicant did so tell the Camp Physician in good faith and with no intent to mislead defendant, then it was no defense that such answers were not full and correct. There is no evidence that applicant knew what he had while in the army, for the regulations provide that the soldier must not be told the particular malady he is suffering from.

It is urged, however, that the instruction above referred to (Instruction B) was erroneous because, by the terms of the application and the contract, no local camp officer had any power to waive, and no knowledge or information communicated to the one taking the application could bind the Society. The *waiver,* however, inheres in the fact that defendant accepted the application with the answer to inquiry No. 15 incomplete or partial on its fact and *wholly unanswered* so far as the purpose of the inquiry is concerned. The waiver does not arise out of any knowledge that Zoglin had, that in fact the disease was something else beside tonsilitis. He was not told what it was.

Besides, as to the power of the local Camp Physician to waive, the by-laws are the same as they were in the case of Hereford v. Mystic Workers of the World, 200 Mo. App. 387, except that they now *name* the camp physician as one of the officers of the local camp and provide for his election by it. But he has no duties to perform toward the local camp; his duties relate wholly to the

Head Camp and the Supreme Medical Director. While the local camp now elects him, it is but an empty power and nothing more than a mere *nomination*, since his election must be approved by the Supreme Medical Director, he is commissioned and is removable by him or the Head Consul; and if the selection or nomination made by the local camp is not approved, or if the one selected is removed by the Supreme Medical Director, the local camp must elect another who is likewise subject to the same approval or disapproval and is likewise subject to and governed wholly by the Head Camp or its officers. In other words, the physician is *called* a local camp officer but is not one in point of fact but is the agent of the Society. It was so held in the Hereford case. [See, also, Floyd v. Modern Woodmen, 166 Mo. App. 166; Shotliff v. Modern Woodmen, 100 Mo. App. 138; Modern Woodmen v. Angle, 127 Mo. App. 94; Daffron v. Modern Woodmen, 190 Mo. App. 303] The fact that in the case at bar the application contains a clause that statements to or knowledge of the one soliciting, taking or writing the application should not bind the defendant does not, in our view, change the situation under the particular facts of this case. No false statements as to the disease named in the application were made by applicant to the Camp Physician, nor is it shown anywhere that the latter knew it was influenza or bronchitis that he had. As to psychoneurosis, there is no evidence that he was treated for that or that Dr. Zoglin knew that he had it, or that applicant knew he had it. Indeed, that specific disease, if it is a disease rather than a condition, was not mentioned in the long list of diseases of which he was asked about in Question No. 26a, in reference to which, however, as we have said, no defense was raised in the answer to the petition.

It is urged that the defendant's demurrer to the evidence should have been sustained, and the sole ground of this assignment of error, specified in the brief, in that the Benefit Certificate was not signed by the Consul of

the local camp. It was signed by the Consul of the Head Camp and by the clerk thereof and by the clerk of the local camp but not by the Consul of the local camp, whereas the by-laws provide that no benefit certificate shall be in force or effect until the benefit certificate is signed by the applicant, the local consul and clerk. This defense, however, was not set up in the answer, and hence cannot be relied upon.

With reference to the defense that Golding was not adopted—i. e., initiated—into, the local camp, the court instructed the jury, in plaintiff's behalf, that the burden was not on the plaintiff to prove he was adopted but was on defendant to prove he was not adopted, and that unless they found he was not adopted at a regular meeting of said camp at the Camp Hall the defendant had failed to establish the defense founded on the failure of Golding to become initiated. For the defendant, the court instructed the jury that unless they found he was adopted in the Camp Hall at a regular, adjourned or special meeting of said camp, they should find for defendant. It is urged that plaintiff's instruction placing the burden of proof in this regard on defendant is erroneous.

The determination of this question depends upon whether adoption is such an essential element of plaintiff's cause of action as to require him to allege and prove it before he can ask the court to render judgment on the contract. Under the by-laws, the issuance of the policy precedes the adoption but delivery thereof is made *after* that. Consequently, when plaintiff alleges and proves that a policy was issued and delivered and that the insured is dead he has shown a complete cause of action. And the issued and delivered policy is evidence of a valid contract, placing on defendant the burden of showing the contrary. It is so held even in fraternal beneficiary contracts. [Fisher v. Supreme Lodge Knights and Ladies of Honor, 190 Mo. App. 606, 615.] Adoption is a fact lying wholly within the knowledge of the Society

and is not within the knowledge of a plaintiff beneficiary; and in addition to this, the issue as to adoption arises only when the lips of the person who is the subject of the initiation are sealed in death. The case at bar is not like Griffith v. Continental Casualty Co., 235 S. W. 83. There the contract was an *accident* insurance policy, and before plaintiff was entitled to have judgment, she must allege and prove, as a part of her case in the first instance, an *accidental* death else her cause of action did not come within the contract which she relied on to support the demand or cause of action asserted. But such is not this case. Here, the possession of the *delivered* policy and the admitted death of insured named therein made a prima-facie case, so that the burden was on defendant to refute that case by setting up and proving that there is no liability on that contract because insured was never adopted, a thing which was exclusively within the knowledge of defendant and not plaintiff. It is true, section 34 of the by-laws provides that the certificate "shall not be of force and effect" until adoption is had, and section 43 says liability "shall not begin" until applicant shall have been adopted, but this merely permits the Society, where a policy has been issued and delivered, to set up and prove, as a defense to liability, the fact that the person named as insured was not adopted, and the rule as to burden of proof in this regard is the same as in any other defense an insurer may set up.

It is perhaps well to say that it is not conceded that young Golding was never adopted. Indeed, there is no one who testifies he was not adopted. Dewey Camp met on the evening of the first and third Tuesdays of each month. The first Tuesday in April, 1919, was on April 1st and a meeting was held on that day, but there was concededly no meeting held between that time and the date of Golding's death on April 26th. The policy was issued on March 20th, and hence April 1st was the only meeting at which young Golding could have been initiated. The claim of the defendant that he was not adopted

rests, in large measure, on the fact that the record of the meeting held on April 1st does not contain the name of Charles Solomon Golding among those who were adopted that night. But Rubin, the Camp Clerk, called as a witness for defendant to prove that Golding was not initiated would not swear he was not, but stated that it was possible for Golding to have been initiated and he not know of it, as he was busy at his desk collecting money. He produced his record book and from that it appeared, in the case of others known to be members and treated as such, the records failed to show their initiation. He testified that he was not acquainted with Golding and if he ever met him at all it was on the occasion of that night. Hence he could not testify from recollection whether he was or was not initiated. Rubin's pass report for the month of April was, as usual, sent to the Head Camp in the month following, about May 15th so as to get it to the Head Camp about May 18th. This pass report showed Charles Solomon Golding's name along with a list of others as having been adopted or initiated on *April 1st*. His cash book showed the assessment collected from him, among other names listed under date of April 15th; but he testified on cross-examination that this did not necessarily mean that he collected it on that day or that he had not collected it on April 1st, because often money was paid to him of which he merely made a memorandum and later entered it on his cash book. The policy had endorsed on it the certificates of Rubin the clerk that Golding was "adopted first day of April, 1919." Defendant also called the Consul of the local camp but he was not sure that he was present on the evening of April 1st; and said that in his absence the Past Consul initiated for him. The Past Consul certified, in the proofs of death, that Golding had "joined the Camp by adoption on April 1, 1919," but the Past Consul was not called to testify.

Defendant also introduced the deposition of plaintiff, taken about a year and a half after his son's death,

in which he stated that his son was not initiated; but in rebuttal, plaintiff was placed on the stand and (the court not being able to understand him clearly, he being a Russian), he was examined by an interpreter and explained that when he said his son did not go to the lodge he had reference to a former occasion and not to the meeting of April 1st which he himself did not attend and, therefore, he did not know whether his son was initiated or not, but that on that evening his son dressed up and went away saying he was going to the lodge.

In addition to the certificate of the clerk on the policy that Golding was adopted April 1st, and the Past Consul's certificate on the proofs of death that he was adopted on that date, defendant's General Counsel, in complete charge of the matter of the claim based on the policy and to whom the same had been referred by defendant, wrote plaintiff's attorney on August 11, nearly five months after Golding's death, that the reason for rejecting the claim was that deceased was not in good health "at the date of his adoption and the delivery of his certificate" and on September 9, 1919, in answer to an inqury for more specific reasons, General Counsel again wrote "It appears that deceased was *adopted April 1, 1919,* at which time our requirements were that he must have been in good health," etc.   (Italics ours.)

Point is made that reversible error was committed in giving plaintiff's instruction C.   This instruction told the jury in effect that Inquiry No. 15, and the other inquiries as to whether applicant had had any of the diseases named or other disease, referred to only some settled disease as might result in impairment of health, but not to a mere trivial passing or temporary indisposition; and if the things for which he was treated by physicians and the ailments he had while in the Infirmary at Camp McArthur, were of a trivial passing or temporary nature from which he quickly and entirely recovered, then such matters were not diseases or ailments within the meaning of those words as used in

the application, and said Golding was not bound to mention or disclose them in answering said questions, and in such case his failure to mention or disclose such was no defense. Of course, this instruction was incorrect in saying that inquiry No. 15 had reference only to treatments by physicians for serious matters, but, as defendant waived inquiry No. 15 as heretofore shown, it is not seen how this can be said to constitute reversible error. The instruction was a correct statement of the law with reference to diseases bearing on the statement as to applicant's condition of health and also concerning which inquiry No. 26a was made, for they do not refer to trivial matters or to slight or transient indispositions which had no bearing upon general health and the continuance of life. [97 Mo. 636, 649-50.] However, as heretofore stated, no defense was raised as to any breach of warranty with reference to inquiry No. 26a.

In instruction No. 5 defendant referred to the questions in its preceding instructions wherein it had stated the questions which we have shown were set up in the answer, and then said that if any of the answers to such questions were untrue in any respect whatever, whether due to ignorance, mistake or otherwise, the jury must find for defendant. The court modified this instruction by adding thereto the following: "unless you further find from the evidence the facts to be as set out in instruction 'B.'" From what we have said as to waiver and as to instruction "B," it follows that there was no error in this modifying the instruction. This applies also to the same modification made to instruction 9 covering practically the same matter.

The judgment is affirmed. All concur.

ON MOTION FOR REHEARING.

TRIMBLE, P. J.—The opinion, in discussing the good faith of young Golding, the insured, in answering questions propounded to him by Dr. Zoglin the Camp

physician, and in referring to instruction B in connection therewith, may perhaps convey the impression that the instruction merely told the jury that if young Golding acted in good faith, then the answers, even though not full and correct, constituted no defense. Of course, this was not a complete characterization of the instruction; and we had no intention of announcing a rule that if an applicant made incorrect answers, nevertheless, if he did so in good faith, they could not be depended upon to avoid the insurance as broken warranties. The instruction, in effect, told the jury that if insured made a full and frank disclosure to defendant's Camp Physician of all the matters claimed to have been misrepresented, and that the Camp Physician thereupon filled out the application in his own way and wrote down only so much of the information given him as he deemed important or essential, *and* that young Golding acted in good faith and without intent to deceive, *then* it was no defense that the statements and answers written down by the Camp Physician were not full and correct.

The good faith of young Golding was mentioned in the opinion, not as the determinative factor of whether incorrect or incomplete answers could be relied upon as a defense, but merely to show that there was no element of fraud on the part of young Golding or any attempt to deceive the Camp Physician. The idea being in our mind that, even if the Camp Physician did act in such way as to waive certain matters, yet if young Golding also had in his mind an intent to deceive, and carried it out even in the slightest degree, his wrongful procedure would nevertheless permeate and taint his insurance, notwithstanding the Camp Physician's waiver.

We have carefully considered the motion for rehearing, but are of the opinion it should be overruled. It is so ordered. All concur.